J-S64017-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.C.R. A/K/A M.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: V.Y.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2037 EDA 2018 |

Appeal from the Decree June 13, 2018
In the Court of Common Pleas of Philadelphia County Family Court at No:
CP-51-AP-0001060-2017

BEFORE: BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY OLSON, J.:          **FILED DECEMBER 11, 2018**

V.Y.R. ("Mother") appeals from the decree and order entered June 13, 2018, granting the petition filed by the Philadelphia Department of Human Services ("DHS") seeking to involuntarily terminate her parental rights to her minor, female child, M.C.R. a/k/a M.R., born in April 2009 ("Child"), with O.R. a/k/a O.R., Sr. ("Father"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).[1, 2]   We affirm.

---

[1] In a separate decree entered June 13, 2018, the trial court also involuntarily terminated the parental rights of Father to Child pursuant to section 2511(a)(2), (5), (8), and (b) of the Adoption Act.  Father is not a party to this appeal, but has filed a separate appeal, assigned Docket No. 1896 EDA 2018, which we address in a separate Memorandum.

[2] The trial court also entered an order on June 13, 2018 that changed Child's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351.

The trial court accurately and aptly set forth the factual background and procedural history of this case in its opinion filed on August 15, 2018, pursuant to Pa.R.A.P. 1925(a), which we adopt herein. Trial Court Opinion, 8/15/18, at 1-8. Importantly, on May 9, 2018, the trial court held an evidentiary hearing on the termination petitions with regard to Mother and Father. Attorney Stuart Maron represented Child as her Child Advocate/Guardian *ad Litem* ("GAL"), and Attorney Charles Andrew Rosenbaum as her special legal counsel.[3] At the hearing, DHS presented a number of witnesses on its behalf. Both Mother and Father were present, were represented by counsel, and

_____

This order was filed at a different trial court docket number than the decree granting the petition for involuntary termination. Originally, Mother filed a single notice of appeal from both the decree and the order which contained both docket numbers. This Court issued a rule to show cause why the appeal should not be quashed as the notice of appeal did not comply with Pa.R.A.P. 341(a) which requires that separate notices of appeal must be filed at both docket numbers. Order, 9/4/18. *See Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018). In Appellant's reply to the show cause order, counsel for Mother indicated that Mother was only appealing the petition which terminated her parental rights and that she was not appealing the goal change order. Appellant's Reply to Order to Show Cause, 9/5/18. As Mother is only appealing the decree entered at docket number CP-51-AP-001060-2017, we shall not quash this appeal and we amend the caption accordingly.

[3] In *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017) (plurality), our Supreme Court held that 23 Pa.C.S. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interest as synonymous with his or her preferred outcome. *Id.* at 1092. Here, Child had both legal counsel and a GAL, and her preferred outcome, which, at times, is to return to the sexually abusive situation in her parents' home, is part of the record. *See* N.T., 5/9/18, at 29, 66; N.T., 6/13/18, at 7. Accordingly, the mandates of *L.B.M.* are satisfied as to the ascertainment of Child's preferred outcome.

- 2 -

testified on their own behalf. Both counsel for Child were present, but Child was not present, and her counsel did not offer her preferred outcome of the proceedings. The court continued the hearing to June 13, 2018, so that it could hear testimony regarding Child's preferred outcome. At the conclusion of the hearing on June 13, 2018, the trial court entered its termination decrees and goal change order.

On June 29, 2018, Mother, acting *pro se*, filed a notice of appeal, attaching a concise statement pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), stating that she was represented by counsel and uncertain of the errors to indicate. On July 3, 2018, the trial court vacated the appointment of Attorney James B. King, who had been Mother's trial counsel. That day, the trial court appointed Attorney Lisa Marie Visco as Mother's counsel. On July 11, 2018, the trial court directed Attorney Visco to file a supplemental concise statement within 21 days. On July 16, 2018, Attorney Visco filed a concise statement on behalf of Mother.

In her brief on appeal, Mother raises the following issues:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, V.R.[,] pursuant to 23 Pa.C.S.A. [§] 2511(a)(1) where Mother presented evidence that she tried to perform her parental duties[?]

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, V.R.[,] pursuant to 23 Pa.C.S.A. [§] 2511(a)(2) where Mother presented evidence that she has remedied her situation by maintaining housing, taking parenting classes and mental health treatment counselling and classes at SAGE[,] and has the present capacity to care for [C]hild[?]

- 3 -

3. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, V.R.[,] pursuant to 23 Pa.C.S.A. [§] 2511(a)(5) where evidence was provided to establish that [C]hild was removed from the care of [] Mother and Mother is now capable of caring for [C]hild[?]

4 Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, V.R.[,] pursuant to 23 Pa.C.S.A. [§] 2511(a)(8) where evidence was presented to show that Mother is now capable of caring for [C]hild after she completed parenting classes, secured and maintained housing and receiving mental health treatment and participating in SAGE[?]

5. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother, V.R.[,] pursuant to 23 Pa.C.S.A. [§] 2511(b) where evidence was presented that established [C]hild had a close bond with [] Mother and [Child] had lived with [] Mother for the most part of her life. Additionally, Mother maintained that bond by visiting with [C]hild when she was permitted to visit her[?]

Mother's Brief at 9.[4]

In reviewing an appeal from the termination of parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision

---

[4] We note that the trial court did not terminate Mother's parental rights under section 2511(a)(1), although DHS sought termination pursuant to that section. N.T., 6/13/18, at 8-9; Trial Court Opinion, 8/15/18, at 11.

- 4 -

may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Pennsylvania Supreme Court] discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. [The Supreme Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some internal citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.*, *quoting In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *See*

*In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will consider section 2511(a)(2) and (b).

In her brief, Mother argues that the trial court erred when it terminated her parental rights to Child under section 2511(a)(2) because the evidence presented at trial showed that she had remedied the conditions that caused Child to be placed in foster care. Mother's Brief at 11, 16-17. Citing *In re Adoption of A.N.D.*, 520 A.2d 13 (Pa. Super. 1986), Mother asserts that past incapacity, alone, is not sufficient to support termination, and that she is now able to care for Child. Mother's Brief at 16-17. With regard to section 2511(b), Mother contends that evidence was presented that Child had lived with Mother for most of Child's life, and that Child had a strong bond with Mother. *Id.* at 13 and 19. Mother states that Child wished to visit Mother and live with her, and that Child's wishes were never taken into account. *Id.* at 19. Mother asserts that, when the trial court suspended her visits, Mother should have been given therapeutic visits and/or Parent Child Interactive therapy so that she could continue to have visitation with Child. *Id.* at 19-20.

Section 2511 provides, in relevant part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without

- 6 -

essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The Supreme Court set forth our inquiry under section 2511(a)(2) as follows.

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

> *In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986) *quoting **In re: William L.***, 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 47 A.3d at 827.

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotations omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with the mother would be contrary to the child's best interests).

Our Supreme Court has stated that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *See In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) *quoting In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008). The Supreme Court stated, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *See In re: T.S.M.*, 71 A.3d at 267 *quoting In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J. dissenting).

While Mother may claim to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). We stated in *In re Z.P.*, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

Here, our review of the record demonstrates that there is sufficient, competent evidence in the record that supports the trial court's factual and legal determinations. Thus, we will not disturb the trial court's decision. ***In re Adoption of S.P.***, 47 A.3d at 826-27. Accordingly, we affirm the trial court's decree terminating Mother's parental rights to Child pursuant to section 2511(a)(2) and (b) of the Adoption Act, on the basis of the well-reasoned and thorough analysis set forth in Judge Deborah L. Canty's August 15, 2018 opinion. ***See*** Trial Court Opinion (Mother), 8/15/18, at 1-20. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Canty's August 15, 2018 opinion.

Decree and order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/11/18

- 11 -

IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION[1]

IN RE: M.R. a/k/a M.C. R, a minor : CP-51-AP-0001060-2017/ CP-51-DP-0001962-2016

:

: FN-001617-2016

:

APPEAL OF: V.R. a/k/a V.Y.R., Mother : Superior Court No. 2037 EDA 2018

**OPINION**

**INTRODUCTION**

V.R. a/k/a V.Y.R. ("Mother"), appeals from the decree and order entered by the Court on

June 13, 2018, granting the petition filed by the Philadelphia Department of Human Services

("DHS") involuntarily terminating her parental rights to her minor female child, M.R. ("Child").

After a full hearing on the merits, the Court found that clear and convincing evidence was

presented to terminate the parental rights of Mother.[2] As discussed in greater detail below, the

trial Court terminated Mother's parental rights because Mother, during the nearly two years that

the Child was in the custody of DHS, did not complete her Family Service Plan ("FSP")

---

[1] Mother's parental rights were involuntarily terminated on June 3, 2018. At the conclusion of the hearing, Mother's counsel stated that his client would be filing an appeal and claiming ineffective assistance of counsel. On June 29, 2018, Mother filed a pro se appeal that did not state any matters complained of. Upon receipt of Mother's appeal and based on the statement of Mother's initial counsel, that Mother would file an appeal and argue ineffective assistance of counsel, Mother's counsel was vacated July 3, 2018. New counsel was administratively appointed on or about July 3, 2018. Mother's new counsel was ordered to provide this Court with a Pa.R.A.P. 1925(b) Statement within twenty-one days of administrative appointment. Mother's new counsel filed a Statement of Matters Complained on July 16, 2018.

[2] Father's parental rights were also involuntarily terminated June 13, 2018, and an appeal followed which will be addressed separately.

objectives also known as Single Case Plan ("SCP") objectives, nor completed any of the recommendations from her Parenting Capacity Evaluation ("PCE"), and has made no effort to gain the safety and protective capacities necessary to aide in establishing a positive, healthy maternal relationship with the Child. Furthermore, the Child, who was nine years old at the time of the hearing, was doing well in the pre-adoptive home of her foster mother who has gained the favor of the Child and has worked toward stabilizing the Child's behaviors while in her care.

In light of Mother's failure for almost two years to meet her SCP objectives, her failure to comply with Court Orders that were in place to protect the Child, her inability to demonstrate safety and protective capacities, and the lack of a positive, healthy, maternal relationship with the Child, the trial court properly granted DHS's Petition to Terminate.

## TERMINATION HEARING

On November 31, 2017, DHS filed Petitions to Involuntarily Terminate Mother's Parental Rights and to Change the Child's Goal to Adoption. On May 9, 2018, the Court heard testimony on DHS's Petitions to Terminate Mother's Parental Rights and the Goal Change to Adoption and held its decision in abeyance pending an investigation and conversation with the Child by her Special Child Advocate, Mr. Charles Rosenbaum, Esquire. Mr. Rosenbaum was solely responsible for gaging and presenting the Child's wishes to the Court for the purpose of the Termination of Parental Rights and Goal Change Hearings. (N.T. 5/9/2018, pg. 29 at 1-19). On June 13, 2018, the Court heard testimony from Mr. Rosenbaum, who presented the Child's wishes followed by the Court's decision to terminate parental rights and change the goal to adoption. (N.T. 6/13/2018, pgs. 1-22).

Katherine Holland, the City Solicitor ("City"), presented testimony from multiple witnesses, which included, Psychologist, Dr. Erica Williams, Community Umbrella Agency ("CUA") current and past supervisors, John Hall and Jennifer Harris, respectively, the current CUA Case Manager, Shannin Hawkins, and the CUA Visitation Coach, Raymond Nichols, all of whom the Court found credible. The relevant testimony is stated below.

The City first presented the testimony from Dr. Williams, who performed a PCE of Mother in November 2017. Dr. Williams testified that she concluded that there were concerns about Mother's capacity to provide safety and permanency for the Child at the time of the evaluation, but also that she remained concerned as the issues had not yet been resolved. (N.T. 5/9/2018, p. 36 at 8-25 and pgs. 37-40). Specifically, Mother had not participated in the Child's therapy which would focus on the sexual abuse that led to the Child's removal from Mother. (N.T. 5/9/2018, p. 36 at 16-19). As a part of Dr. Williams' assessment in November 2017, Dr. Williams recommended that Mother receive some measure of therapeutic intervention to assist Mother in understanding her own role in the Child's removal from the home. (N.T. 5/9/2018, p. 37 at 24-25 and p. 38 at 1-8). Dr. Williams based this recommendation on the fact that Mother did not take responsibility for the contact that she allowed between the perpetrator and the Child even though she was aware of the sexual abuse in her home and the subsequent removal of the Child from her home. (N.T. 5/9/2018, p. 37 at 9-17). Dr. Williams based this recommendation also on the fact that Mother admitted that she did not understand that telephone contact with the perpetrator was an issue; and also because Mother then blamed the Child for snatching the telephone to try to have contact with the perpetrator. (N.T. 5/9/2018, p. 37 at 14-17). Dr. Williams further based this recommendation on the fact that there was a pattern of concern with Mother's interactions with the Child so much so that the visits were line of sight and line of

hearing due Mother causing the Child to experience fear and saying things to upset the Child, including that Mother did not love the Child. (N.T. 5/9/2018, p. 39 at 11-18).

Dr. Williams testified that she was concerned about Mother's safety and permanency capacity because Mother lacked a comprehensive and concrete home plan, that the space Mother lived in had not been investigated and that it was unclear if Mother and the Child would be welcomed to stay in the home where Mother lived. (N.T. 5/9/2018, p. 36 at 12-25 and p. 37 at 1-8). Dr. Williams further expresses concerns about the complex family and financial issues in the home Mother was living in- particularly, that Mother had a financial guardian appointed. (N.T. 5/9/2018, p. 36 and p. 37 at 1-8).

The next witness, Mr. John Hall, the current CUA case manager supervisor, testified that in July of 2016 DHS received a Child Protective Services ("CPS") report that the Child was sexually abused by a sibling. (N.T. 5/9/2018, p. 51 at 14-16). Subsequently, DHS received a General Protective Services ("GPS") report in August of 2016, of inadequate housing, parents admitting to a roach infestation, concerns with the physical structure of the home, and that a Delinquent Court Stay-Away Order was violated by allowing the Child to remain in contact with the perpetrator who no longer resided in the home. (N.T. 5/9/2018, p. 51 at 17-25 and p. 52 at 1-7). As a result, an Order of Protective Custody ("OPC") was obtained and the Child has remained in placement for approximately the last twenty months. (N.T. 5/9/2018, p. 52 at 5-19).

Mr. Hall also testified that not only had SCPs been given to Mother for the life of the case, that Mother was invited to attend the SCP meetings, and that the SCP objectives had been explained to Mother throughout the duration of the case. (N.T. 5/9/2018, p. 52 at 23-25 and p. 53 at 1-19). Mother's objectives included: attend domestic violence as a victim, attend the Achieving Reunification Center ("ARC") for Housing and Parenting, Visitation, to complete a

PCE, which recommended mental health treatment, and to participate in the Parent Action Network SAGE program. (N.T. 5/9/2018, p. 53 at 21-25, p.54 at 1-23). Even though Mother had been referred to the SAGE program for eighteen months, she had just begun consistently attending March 1, 2018. (N.T. 5/9/2018 p. 54 at 22-25 and p. 55 at 1-11). Regarding domestic violence, Mother was referred however, CUA is unsure of Mother's participation, yet Mother is still in a relationship with Father. (N.T. 5/9/2018 p. 54 at 13-21 and p. 56 at 17-19). Mother completed the PCE. (N.T. 5/9/2018 p. 54 at 3-5). Regarding mental health treatment, CUA testified that Mother had been referred for mental health and that she completed an evaluation however, it was unknown if she was currently seeking treatment. (N.T. 5/9/2018 p. 55 at 12-18). CUA also testified that Mother completed the Parenting class at ARC, yet there were still concerns about her ability to parent as Mother violated the Court Order in allowing the Child to talk to the perpetrator on the telephone. (N.T. 5/9/2018 p. 55 at 19-25 and p. 56 at 1-7). Regarding the housing program at ARC, CUA testified that Mother never participated in the program and that Mother had not asked CUA to conduct an assessment of the current home. (N.T. 5/9/2018 p. 54 at 13-18 and p. 56 at 8-16).

With respect to visitation, Mother's visits were temporarily suspended March 14, 2018 by this Court pending a full hearing. (DRO 3/14/2018). At the next court date, May 9, 2018, the Court suspended all of Mother's visits indefinitely, including telephone contact with the Child. (DRO 5/9/2018). Mr. Hall testified that the Child had not had any visits with Mother since March 9, 2018 and that of the behavioral issues the Child displayed, to his knowledge, none of them were related to not seeing her parents. (N.T. 5/9/20118, p. 61 at 3-12). Mr. Hall opined that the Child has positive interaction with the foster parent, that the Child likes the foster parent, the foster parent is meeting the Child's needs, that the Child's problematic behavior stabilized with

the foster parent and the Child's behaviors in school increased when temporarily removed from the foster parent for a brief Respite Home Placement.[3] (N.T. 5/9/2018 p. 60 at 24-25, p. 61 at 1-2, p. 62 at 11-25 and p. 63 at 1).

Finally, Mr. Hall testified that, in his opinion, the Child would not suffer any irreparable harm if Mother's rights were to be terminated. (N.T. 5/9/20118, p. 63 at 2-6). Mr. Hall based his opinion upon the fact that the Child does not have a positive healthy maternal relationship with Mother and also upon the fact that the Child's therapist does not believe that they should have any contact presently (N.T. 5/9/2018, p. 63 at 7-9 and 24-25 and p. 64 at 1). Furthermore, he based his opinion on the fact that the Child stated that she wished to return home so that her brother could sexually assault her again. (N.T. 5/9/2018 p. 66 at 2-19).

The third witness, Ms. Jennifer Harris, testified that she was the CUA case manager supervisor from May 2017 to about January 2018. (N.T. 5/9/2018 p. 68 at 22-23). Ms. Harris said that Mother was made aware of her objectives throughout the life of the case by her staff as there was regular communication about the SCP objectives. (N.T. 5/9/2018 p. 68 at 25 and p. 69 at 1-2 and 20-23). She testified that Mother never completed any mental health objectives outside of the PCE. (N.T. 5/9/2018 p. 69 at 15-19).

The fourth witness presented by the City was Ms. Shannin Hawkins, the current CUA case manager who took over the case approximately six months before the termination hearing. (N.T. 5/9/2018 p. 75 at 9-16). Ms. Hawkins testified that there are concerns with the Child's behaviors in the foster home but that the behaviors are typical for a nine year old. (N.T. 5/9/2018 p. 75 at 23-24). On Mother's cross-examination, Ms. Hawkins clarified that the Child has always

---

[3] Mr. Hall testified that the Child was temporarily removed from her pre-adoptive foster home and temporarily placed into Respite Care after what seemed to be a retaliatory phone call was made to DHS with false allegations, causing a DHS Investigation which was determined to be invalid. The Child returned to the pre-adoptive foster home. (N.T. 5/9/2018 p. 62).

had behavioral concerns and that her behaviors progressed since returning from Respite Care (N.T. 5/9/2018 p. 80 at 19-25 and p. 81 at 1). Furthermore, Ms. Hawkins testified that the Child disclosed that Mother was aware of the sexual abuse. (N.T. 5/9/2018 p. 76 at 22-25 and p. 77 at 1). Based on the interaction during several visits, Ms. Hawkins testified that she was concerned about the Child being in Mother's care and opined that the Child would not suffer any irreparable harm should Mother's rights be terminated. (N.T. 5/9/2018 p. 77 at 11-17). Ms. Hawkins also based her opinion of the fact that Mother and Child do not have a positive healthy maternal relationship and that although the Child misses Mother, the Child does not talk about Mother unless asked. (N.T. 5/9/2018 p. 77 at 22-24 and p. 81 at 12-21).

The City's final witness, Mr. Raymond Nichols, the CUA Visitation Coach, who also assists with transporting the Child for visits, testified that he has concerns about Mother and Child so much so that he believes they should not have visits. (N.T. 5/9/2018 p. 89 at 7-10, p. 84 at 5-9, p. 89 at 7-25 and p. 89 at 1-12). One concern is that Mother did not do much to protect the Child during the visits when Father would curse and scream or raise his voice at the Child and Mother (N.T. 5/9/2018 p. 89 at 13-15). Mr. Nichols was also concerned about Mother's protective capacities because Mother would influence conversation with the Child regarding the perpetrator of the sexual abuse she experienced (N.T. 5/9/2018 p. 89 at 16-18). Further, Mr. Nichols was concerned that Mother violated the Stay-Away Order issued (which included no telephone communication between the Child and perpetrator) by attempting to contact the perpetrator on multiple occasions during the Child's visits with Mother. (N.T. 5/9/2018 p. 90 at 1-12). Another concern of Mr. Nichols is that Mother would not stop Father from kissing the Child on the lips, sometimes multiple times at once. (N.T. 5/9/2018 p. 86 at 17-20, and p. 89 at 19-20). Similarly, Mr. Nichols was concerned that Mother would not stop Father from sitting the

Child on his lap, turning the child to face him and opening her legs. (N.T. 5/9/2018 p. 86 at 21-23, and p. 89 at 21-25). Based upon the reasons above, Mr. Nichols opined that the Child would not suffer any irreparable harm if Mother's rights were terminated and that they do not have a positive, healthy maternal relationship. (N.T. 5/9/2018 p. 90 at 13-19).

During Mother's direct testimony, she testified that she had no knowledge of the abuse prior to DHS' involvement. (N.T. 5/9/2018 p. 92-93). Mother also testified that to the best of her ability, she fully participated in and completed all of her SCP objectives including mental health and domestic violence, however, did not bring any documentation to Court and stated that she had not learned of the domestic violence requirement until that day in Court.(N.T. 5/9/2018 p. 92-96). Mother also testified that she was present in Court for most of the hearings and may have been at each hearing. (N.T. 5/9/2018 p. 96 at 11-13). Mother also testified that she was aware that the Child and perpetrator were not allowed to have telephone contact, yet she stated that she would continue to bring her cell phone into the visits as Mother takes care of her mother. (N.T. 5/9/2018 p. 96 at 14-25 and p. 97 at 1-9). On cross-examination, Mother testified that CUA and other parties assessed her current residence over a year ago and that she showed them the basement, and informed them of her plan to have the Child, the victim of sexual abuse, live in that same home with the perpetrator of the sexual abuse. (N.T. 5/9/2018 p. 94 at 23-25, p. 95 at 1-8, and pgs. 98-99).

At the end of the hearing, the Court granted DHS's Petition to Termination of Parental Rights of Mother.

## APPELLANT'S ARGUMENTS

In her Statement of Matters Complained of on Appeal, Mother avers the following:

1. The trial court erred and/or abused its discretion by entering an order on January 10, 2018 involuntarily terminating the parental rights of Mother, V.R. More specifically, the trial court abused its discretion as substantial, sufficient and credible evidence was presented at the time of trial which would have substantiated denying the Petition for Goal Change Termination. The City has failed to meet its burden for termination by clear and convincing evidence under 23 P.a.V.R.A. sections 2511 (a) (1) (2) (5) and (8).

2. The trial court erred and/or abused its discretion by terminating Mother, V.R., pursuant to 23 P.a.V.R.A. sections 2511 (b), where the DHS failed to prove by clear and convincing evidence that involuntarily terminating her parental rights would best serve the emotional needs and welfare of her child.

3. The trial court erred and/or abused its discretion when it terminated mother's parental rights and changed the child's goal to adoption.

## STANDARD OF REVIEW

When reviewing an appeal from a decree terminating parental rights, an appellate Court is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 Pa.C.S.A. §2511(a) in order to affirm a termination of parental rights. In re D.A.T., 91 A.3d 197 (Pa. Super. 2014).

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, the appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 Pa. Super. 54, 111 A.3d 1212, 1215 (2015).

## A. The Trial Court Properly Found that the Department of Human Services Met Its Burden by Clear and Convincing Evidence To Terminate Mother's Parental Rights Pursuant to 23 Pa.C.S.A. §2511(a)(2),(5) and (8)[4].

Termination of parental rights is governed by 23 Pa.C.S.A. §2511. In termination cases, the burden is upon DHS to prove by clear and convincing evidence that its asserted grounds for seeking termination of parental rights are valid. In the Interest of B.C., 36 A.3d 601, (Pa. Super. 2012). In the instant case, DHS's petition asked the Court to terminate Mother's parental rights under §2511(a)(1),(2),(5), and (8). However, the Court terminated Mother's parental rights pursuant to §2511(a)(2),(5), and (8) only and therefore, will only address those sections in the opinion. In light of Mother's failure for almost two years to meet her SCP objectives, her failure to comply with the Court Orders that were in place to protect the Child, her inability to demonstrate safety and protective capacities and the lack of a positive, healthy, maternal relationship with the Child, the trial court properly granted DHS's Petition to Terminate.

---

[4] 23 Pa.C.S.A §2511(a)- **General Rule**- the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

    (2)    The repeated and continued incapacity, abuse, neglect, or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for her physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

    (5)    The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

    (8)    The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

**1. The Trial Court Properly Granted the Petition to Terminate Parental Rights Pursuant to 23 Pa.C.S.A. § 2511(a)(2).**

Section 2511(a)(2) requires that "repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for her physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S.A. §2511(a)(2). These grounds are not limited to affirmative misconduct; "to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties." In re N.A.M., 33 A.3d 95 (Pa. Super. 2011).

The Supreme Court, in In re Geiger, 459 Pa. 636, 331 A.2d 172, 174 (1975), enunciated the fundamental test in termination of parental rights under what is now 2511(a)(2) as requiring the Petitioner to prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied."

Section 2511(a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for her physical or mental well-being. In re Z.P., 994 A.2d 1108 (Pa. Super. 2010).

Parental duty requires that the parent act affirmatively with a good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. In re E.M., 908 A.2d 297 (Pa. Super. 2006). In

other words, a trial court can find an incapacity to parent by finding affirmative misconduct, acts of refusal to parent as well as an incapacity to parent. In re S.C.B., 990 A.2d 762 (Pa. Super. 2010).

The Court found clear and convincing evidence that Mother failed and refused to perform parental duties, failed to address the conditions which brought the Child into placement, and lacks the capacity to adequately provide the care, control and stable environment necessary for the nine year old Child. The Mother's failure to achieve and maintain her objectives and failure to provide the basic needs, safety, and protection of the Child even with the assistance of services demonstrated her incapacity and refusal to parent. In addition, there is no question that Mother's failure to maintain healthy contact and display appropriate behavior during visits with the Child demonstrated that Mother left her Child without the parental care necessary for her physical or mental well-being.

Mother never demonstrated that she was able to provide proper parental care for her Child. At the time of the termination and goal change hearings, Mother had already undergone a PCE approximately four months prior (in November 2017) and it concluded that she did not present with the capacity to parent the Child. Particularly, Mother did not have the capacity to provide safety for the Child. At the time of the PCE, Mother had yet to fully understand or accept that the Child had been removed from her care because Mother violated the safety plan, Court Orders and services were put into place to keep the Child away from the perpetrator in all forms, even telephonic communication. Mother stated that she knew there was sexual abuse between her children yet failed to take responsibility for the contact that she allowed after the abuse occurred and she did not understand why telephone contact was an issue so in turn, she allowed it. Mother failed to protect the Child from her abuser and Mother failed to protect the Child from

sexual and other hostile advances made by Father in Mother's presence. The PCE recommended that Mother participate in [the Child's] therapeutic program as well as in SAGE in order to achieve and demonstrate the appropriate protective capacity. At the time of the termination hearing, Mother had yet to become involved with the Child's therapeutic treatment and had not completed the SAGE program, both of which would have focused on children who had been victims of sexual abuse. Specifically, Mother had just began attending the SAGE program after having been referred for the program for almost two years; and she had not begun participating in the Child's therapy.

In addition to not having the safety and protective capacities necessary to properly parent the Child, Mother lacked the capacity to provide permanency. The PCE recommended that Mother have a suitable financial plan and suitable housing in order to achieve permanency. At the time of the termination hearing, Mother's home had not undergone a recent home evaluation and Mother lacked a concrete plan on where the Child and the perpetrator would live in the months to come as they still could not both live in the same home with one another. Also, Mother had not had not presented a financial plan or other information to show she was able to provide permanency. Instead, Mother's finances remained under a Power of Attorney, held by maternal grandmother. Extremely intriguing to this Court, however, is that Mother testified that she cares for maternal grandmother so much so that Mother needs access to her cell phone during visits with the Child

Further, the Court was not persuaded that Mother could resolve her dependency issues in the near future. In almost two years, Mother had never participated in any housing assistance programs nor provided a financial plan. Mother had failed to have her visits expanded to unsupervised and instead her visits were reduced to suspended indefinitely. Mother never

addressed the concern of domestic violence yet remains in a relationship with Father who curses and yells as Mother and the Child during visits. Mother also has not demonstrated any active participation with the mental health objective. Mother also did not begin therapeutic intervention with the Child until a few weeks before the termination and goal change hearings. Mother had nearly two years to participate in and successfully complete these objectives.

Finally, a child's life may not be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting. In re Adoption of M.E.P., 825 A.2d 1266 (Pa. Super. 2003). Mother has shown a "repeated and continued incapacity and refusal" to parent the Child. Mother cannot provide a permanent, healthy, safe environment for the Child. Mother's lack of action and slothful last minute efforts to gain the ability to parent the Child demonstrate her repeated and continued incapacity, abuse, neglect, and refusal to parent. The Court finds that Mother will not be able to resolve the dependency issues in the near future. Consequently, for all of the above reasons the Court terminated Mother's parental rights pursuant to §2511(a)(2).

2. **The Trial Court Properly Granted the Petition to Terminate Parental Rights Pursuant to 23 Pa.C.S.A. §2511(a)(5) and (a)(8).**

Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. §2511(a)(5).

The requirements to terminate pursuant to section 2511(a)(8) are similar. "[T]o terminate parental rights pursuant to 23 Pa.C.S.A. §2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the

date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." In re K.T.E.L., 983 A.2d 745 (Pa. Super. 2009).

The Court found clear and convincing evidence to terminate Mother's parental rights pursuant to Sections 2511(a)(5) and (a)(8) for the same reasons discussed above. Particularly, that the Child was removed from the shared home of Father and Mother with an OPC on September 9, 2016 and remained in placement for approximately twenty months by the time of the termination hearing. Furthermore, the conditions that led to the Child's removal (which include: housing, domestic violence, Mother's lack of a financial plan or employment, Mother's inability to keep the Child safe and Mother's violation of the Delinquent Court Ordered Stay-Away between her son and daughter), had not been alleviated by the date of the termination hearing. In addition, the Court found that it was in the Child's best interests to terminate Mother's parental rights because the Child was residing in care for nearly two years and has a pre-adoptive foster parent that has stabilized the Child's behaviors, and whom the Child likes and to whom the Child is well-bonded. Moreover, the Court found that the termination of Mother's parental rights would not be detrimental to the Child's health, safety & well-being as Mother does not have a positive, healthy maternal relationship with the Child.

## B. The Trial Court Properly Found that Termination of Mother's Parental Rights was in the Child's Best Interests and That DHS Met Its Burden Pursuant to 23 Pa.C.S.A. §2511(b)[5].

---

[5] **Other Considerations.-** The Court in terminating the rights of a parent shall give primary consideration to the developmental, physical, and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing, and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

After the trial court finds that the statutory grounds for termination have been satisfied, it must then determine whether the termination of parental rights serves the best interests of the child pursuant to 23 Pa.C.S.A. §2511(b). In the Matter of the Adoption of C.A.W. and A.A.W., 453 Pa. Super. 277, 683 A.2d 911, 917-18 (Pa. Super. 1996). In terminating the rights of a parent, the Court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. §2511(b). "Section 2511(b) centers judicial inquiry upon the welfare of the child rather than the fault of the parent." In re K.Z.S., 946 A.2d 753 (Pa. Super. 2008). Further, "[o]ne major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child. In re C.T. and G.T.F., 944 A.2d 779 (Pa. Super. 2008).

The Child was nine years old at the time of the hearing, and had been in placement for approximately twenty months with two failed kinship placements but has since resided in pre-adoptive home with an appropriate caregiver. The Court relied on the credible statement of Mr. John Hall, who testified that in his opinion the Child would not suffer any irreparable harm if Mother's rights were to be involuntarily terminated. Mr. Hall based his opinion upon the fact that Mother poses a grave threat to the Child by violating the Delinquent Stay-Away and the no telephone contact Orders that were put into place to protect the Child; and also on the fact that the Child does not have a healthy relationship with Mother as the Child indicated that she would like to return home to Mother so that she could be sexually assaulted again by her brother, the perpetrator of the sexual assault that led to the Child's initial removal and placement. In contrast, Mr. Hall opined that the Child has positive interaction and a close-knit relationship with the pre-adoptive foster parent and that the Child likes the pre-adoptive foster parent so much that the

Child's negative behaviors escalated when she was removed from that foster parent and briefly placed in a Respite Home. Additionally, Ms. Shannon Hawkins, whose statements this Court found credible, testified that the Child and Mother do not have a healthy or positive maternal relationship and that the Child would not suffer any irreparable harm if her parental rights were terminated. Ms. Hawkins based her opinion on the fact that the Child does not bring up Mother during their conversations and only mentions Mother if the Child is posed a question regarding Mother. Ms. Hawkins concluded that it is best that the Child and Mother not have any visits as she is concerned with the Child being with Mother. Lastly, Mr. Raymond Nichols, whose testimony was reliable and persuasive, opined that no positive, healthy maternal relationship exists between Mother and Child and that the Child would not suffer an irreparable harm if Mother's parental rights were terminated. Mr. Nichols based his opinion on having observed multiple visits where Mother did not protect the Child from Father's sexual advances, cursing, or screaming; and also where Mother would not protect the Child from the perpetrator by coordinating telephone contact with the Child despite the no telephone contact order. Moreover, Mr. Nichols explained that the Child was fearful of her father and she feared him so much that she would often defecate and or urinate on herself before and/or after the visits with Father, and that Mother would also be present but to no avail. Also, Mr. Nichols based his opinion on the fact that during the visits, the Child was so fearful of Father that she would revert back to a very child-like stage, unable to have normal or usual discussions or utter anything at all, yet Mother did nothing to protect the Child.

Based upon these facts, the Court concluded that it would be in the Child's best interest to be adopted. Additionally, while Mother completed a parenting class, it is obvious that she still does not possess the skills necessary to provide a safe, nurturing, loving home, and to

appropriately meet and foster the developmental, physical, and emotional needs and welfare of the Child so she is best served by terminating Mother's parental rights.

### C. The Trial Court Properly Found that the Goal Change from Reunification to Adoption was in the Child's Best Interest and the Court's Disposition was Best Suited to the Safety, Protection and Physical, Mental, and Moral Welfare of the Child Pursuant to 42 Pa.C.S.A. §6351 (f.1)[6]

The Court in terminating the rights of a parent shall give primary consideration to the developmental, physical, and emotional needs and welfare of the child pursuant to 42 Pa.C.S.A. §6351 (f.1). The Court found substantial, sufficient and credible evidence was presented to establish adoption as the appropriate goal in the best interest of the Child. Testimony was presented to show that the Child's behaviors are most stable when in the care of the current pre-adoptive foster parent and that the Child regresses when she is not in the care of the current pre-adoptive foster parent. Not only did the Child's therapist and CUA team recommend that it is best that there be no contact between the Child and Mother, visitations with Mother were suspended March 14, 2018 and the Child has shown no indication of the suspension having a negative effect on her; rather, the Child has been forthcoming about the sexual abuse she has suffered and otherwise generally does not discuss her Mother.

Individually and collectively, the detailed testimony from Mr. Hall, Ms. Hawkins and Mr. Nichols that the Child does not have a healthy, positive relationship with Mother was sufficient

---

[6] 42 Pa.C.S.A. §6351-Disposition of dependent Child-(f.1)- Additional determinations. Based upon the determinations made under section (f) and all relevant evidence presented at the hearing, the court shall determine one of the following: (2) if and when the Child will be placed for adoption, and the county adoption will file for termination of parental rights in cases where return to Child's parent, guardian, or custodian is not best suited to the safety, protection and physical, mental, and moral welfare of the Child.

to provide the Court with adequate evidence to evaluate the parent-child relationship between Mother and the Child. The totality of the evidence, including the exhibits admitted during the trial,[7] supports the trial Court's conclusion that termination of the Mother's parental rights and goal of adoption is in the best interest of the Child.

## CONCLUSION

For the foregoing reasons, the Court finds that DHS met its burden by clear and convincing evidence and respectfully requests that the Decree and Order of June 13, 2018, terminating Mother, V.Y.R.'s parental rights pursuant to M.R. and changing the Child's permanency goal to adoption be AFFIRMED.

BY THE COURT:

_____
DEBORAH L. CANTY, J.

---

[7] DHS Exhibits numbers 1 through 8 were admitted into evidence at the termination and goal change hearings and are attached hereto.